UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY SHORT, et al., | No. 2:18-cv-00421-TLN-KJN |
| Plaintiffs, | |
| v. | **ORDER** |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction. (ECF No. 3.) Defendants oppose the motion. (ECF No. 11.) Plaintiffs have filed a reply. (ECF No. 14.) On April 12, 2018, the Court held a hearing and heard oral argument on this motion ("the Motion Hearing").[1] The Court has carefully considered the arguments raised by the parties. For the reasons set forth below, Plaintiffs' motion is DENIED.

I. **INTRODUCTION**

This civil rights action challenges the constitutionality of California's Voter's Choice Act ("the VCA"). The complaint contains a single claim brought pursuant to 42 U.S.C. § 1983 — "Violation of Plaintiffs' Rights Guaranteed Under the Fourteenth Amendment's Equal Protection Clause Contained in the United States Constitution." (Compl., ECF No. 1 at 8–10.) Although

---

[1] The Court has determined that delaying the issuance of this Order until the transcripts of the Motion Hearing are available will disserve the parties and the public interest. Rather, the Court will rely on its notes and recollection of the Motion Hearing for purposes of drafting this Order.

discussed in more detail below, the gist of this claim is that the VCA affords qualified California voters, "depending on the county in which they reside," "greater or lesser access to the franchise of voting," which Plaintiffs contend will "almost certainly result[] in dilution of their votes." (ECF No. 7 at 21.) Ultimately, Plaintiffs seek an order (i) declaring the VCA "unconstitutional under the [Equal Protection Clause of the] Fourteenth Amendment to the United States Constitution," and (ii) a "permanent injunction enjoining each of . . . Defendants, their successors, agents, and assigns from enforcing the [VCA]." (ECF No. 1 at 11.) The instant motion seeks a preliminary injunction.

Plaintiffs are suing Defendants Edmund G. Brown, Jr., in his official capacity as Governor of California, Alex Padilla, in his official capacity as Secretary of State of California, Jill Lavine, in her official capacity as Registrar of Voters for the County of Sacramento, Rebecca Martinez, in her official capacity as Registrar of Voters for the County of Madera, and Gregory Diaz, in his official capacity as Registrar of Voters for the County of Nevada. Throughout this Order the Court will refer to Brown, Padilla, Lavine, Martinez, and Diaz collectively as "Defendants."

On the other hand, for the remainder of this Order, all references to "Plaintiffs" will be solely to Jeffrey Short and Trina T.R. Heter. At the Motion Hearing, the Court questioned whether Plaintiff Sacramento Valley Lincoln Club ("the Club") has Article III standing. The Club has described itself as a nonprofit entity "located in Sacramento County [that] has members who both reside and vote in Sacramento County." (ECF No. 1 at ¶ 10; ECF No. 7 at 12.) The Court will discuss the operation of the VCA in more detail below. It is sufficient for now to repeat the observation made by the Court at the Motion Hearing: if the VCA unconstitutionally discriminates against some California counties (and the qualified voters living in those counties), this discrimination seemingly redounds to the benefit of qualified voters living in Sacramento County. After making this observation at the Motion Hearing, the Court squarely asked Plaintiffs' counsel why the Club had standing. Plaintiffs' counsel's on-the-spot response did not resolve the Court's doubts concerning the Club's standing.[2]

---

[2] The Court wishes to emphasize that this is not meant as criticism of Plaintiffs' counsel. The Court is mindful that this issue had not been briefed in advance of the hearing.

"Federal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Corral v. Select Portfolio Servicing, Inc.*, 878 F.3d 770, 773 (9th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). The Court may not assume that a party has Article III standing in order to reach what it may suspect is an "'easy' . . . question" on the other side of that jurisdictional hurdle. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 99 (1998). Ordinarily, the Court would request additional briefing on this question and definitively resolve the issue. However, given the fast approach of the June 5, 2018 primary election, in the Court's view, the better approach would be to assume for purposes of this Order that the Club *does not have standing*. As a practical matter, the scope of the requested injunction remains the same and this assumption does not necessitate additional briefing to resolve the instant motion. The Court observes that the parties have stipulated that Defendants will have 28 days after the Court enters this Order to file "an answer or otherwise respond to the Complaint[.]" (ECF No. 10 at 2.) If Defendants' response is a motion to dismiss, the Court requests that they address the Club's standing. Otherwise, the Court will order briefing on this point *sua sponte*.

Before turning to the parties' arguments in connection with the instant motion, the Court will set out the standard of review. Additionally, the Court will address two preliminary matters — the operation of the VCA and Plaintiffs' overall theory of the case — to streamline the remainder of the Court's analysis.

II. **STANDARD OF REVIEW**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, under *Winter*, the movants must show four things to receive a preliminary injunction. *Id*. at 20. First, the movants must show that they are likely to succeed on the merits. *Id*. Second, the movants must show that they are likely to suffer irreparable harm in the absence of preliminary relief. *Id*. Third, the movants must show that the balance of equities tips in their favor. *Id*. Finally, the movants must show that an injunction is in the public interest. *Id*.

In the Ninth Circuit, courts apply a sliding-scale approach to *Winter*'s four-prong test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Under this approach, a preliminary injunction may issue where the movants have raised "serious questions on the merits"— rather than a more complete showing that it is likely to succeed on the merits — so long as the balance of hardships tips sharply in the movants' favor and they satisfy the other two *Winter* prongs. *Id*. at 1135 Whether or not the sliding-scale approach is used, the movants are required "to make a showing on all four prongs" of *Winter* to obtain a preliminary injunction. *Id*. Ultimately, "[a] preliminary injunction . . . should not be granted unless the movant[s], *by a clear showing*, carr[y] the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

### III. PRELIMINARY MATTERS

A. Operation of the Voter's Choice Act

Having carefully reviewed the parties' submissions, along with their respective counsel's answers to the Court's questions at the Motion Hearing, the Court understands the parties to be largely in agreement as to the operation of the VCA. The Court will assume the description of the VCA in this section is materially undisputed for purposes of this motion. Ultimately, as the Court's analysis will show, resolution of the instant motion does not turn on this assumption. Moreover, if the Court is mistaken as to the parties' agreement regarding some aspect of the VCA's operation, the Court emphasizes that neither the parties nor the Court will be bound by the Court's description. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

Before describing the operation of the VCA, the Court will make two definitional points. In this Order, the Court will refer to the Counties of Calaveras, Inyo, Madera, Napa, Nevada, Orange, Sacramento, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sierra, Sutter, and Tuolumne as the "Fourteen Counties." Of these, the Court will refer to Madera, Napa, Nevada, Sacramento, and San Mateo as the "Opted-In Counties."

The VCA provides for California counties to conduct "all-mail ballot elections," i.e., "elections in which every voter in a county is mailed a ballot" and "[i]n lieu of polling places being open on election day, 'vote centers' and 'ballot dropoff locations' are available prior to and on election day, where voters may deliver their completed ballots." (ECF No. 7 at 14 (citing Cal. Elec. Code § 3017(a)).) Under the VCA, in a county where an all-mail ballot election is conducted, "all registered voters are automatically sent a vote-by-mail ballot beginning 29 days before an election." (ECF No. 11 at 10.) At the Motion Hearing, the parties agreed that it was a fair assumption that the ordinary voter in such a county would receive his ballot three weeks (or 21 days) before election day. Voters in all-mail ballot elections "will have three options for casting their ballots: (1) return the ballot by mail; (2) return the ballot to any designated ballot dropoff location within the county; or (3) return, or vote and return, the ballot to a vote center." (ECF No. 11 at 10.) At the Motion Hearing, the parties agreed that these voters may mail their ballots as soon as they receive them.

It is undisputed that the Fourteen Counties had the option of opting into the VCA beginning on January 1, 2018. Likewise, it is not in dispute that California's remaining 44 counties were not given the option to conduct all-mail ballot elections for the June 5, 2018 primary ("the 2018 Primary") and the November 6, 2018 general election ("the 2018 General Election"). Further, it is undisputed that only five counties — the Opted-In Counties — actually opted into the VCA to conduct all-mail ballot elections for the 2018 Primary and the 2018 General Election. The Court will refer to the election options in the non-Opted-In Counties as the "Standard Voting Options." The parties agree that voters in each of California's 58 counties — in both the 2018 Primary and the 2018 General Election — will be voting for candidates whose offices represent more than a single county (or parts thereof). Particularly, the parties agreed that candidates for the United States Senate, California Governor, and California Attorney General would be on the ballots in each county for both the 2018 Primary and the 2018 General Election.

The parties seem to agree that California had a "historically low" voter turnout in

///

///

2014.[3] Likewise, the Court understands the parties to agree that the purpose of the VCA's all-mail ballot election option is to increase turnout in the counties in which it is employed. That is, the parties agree that, if the VCA achieves its purpose and works as designed, the expectation is more votes will be cast per 1,000 registered voters in a county conducting an all-mail ballot election than otherwise would have been cast in that same county had the Standard Voting Options been used.

B. <u>Plaintiffs' Theory of the Case</u>

At the Motion Hearing, the Court attempted to summarize Plaintiffs' theory of the case. The Court stated as follows:

> The ordinary voter in an Opted-In County can effectively cast his vote for a period of at least three weeks. The ordinary voter in other counties has some options for obtaining a ballot besides voting in person on election day. However, the ordinary voter, i.e., one who has done nothing besides register to vote, in the other 53 counties will have to vote in person on election day. For those counties that were not permitted to opt-in, the ordinary voter will have less time to cast his vote, including in races for statewide offices (and offices representing more than a single county). Thus, if the VCA achieves its purpose and works as designed, the votes of residents of the counties not permitted to opt-in for the 2018 cycle are diluted. That is, by design, one should expect more votes from Opted-In Counties than otherwise would have been cast under Standard Voting Options thus making votes from the Opted-In Counties a greater percentage of the total votes cast than . . . otherwise would have been cast. It is Plaintiffs' position that: (1) this is a cognizable Equal Protection/voter dilution claim to which strict scrutiny applies, and (2) Defendants cannot satisfy strict scrutiny.[4]

Plaintiffs agreed this was an accurate summary. Further, Plaintiffs did not identify any misstatements. Having re-reviewed the parties' submissions, the Court will make one clarification. Neither Plaintiffs nor Defendants clearly addressed the options available to a voter in a non-Opted-In County who has done *nothing* besides register to vote. The Court assumed without correction that such voters would only be able to vote in person on election day. Whether that assumption is true is immaterial to resolving this motion. As previously noted, the parties

---

[3] At a minimum, they agree that the Assembly Committee on Elections and Redistricting Report, dated June 29, 2016, said as much. (*Compare* ECF No. 7 at 22 *with* ECF No. 11 at 17.)

[4] This language is taken from the Court's notes.

6

agree that if the VCA achieves its *purpose* and works as *designed*, the expectation is *more votes will be cast* per 1,000 registered voters *in a county* conducting an all-mail ballot election than *otherwise would have been* cast in that same county had the Standard Voting Options been used. In other words, the VCA can only be rationally understood as supposing its "all-mail ballot election" option makes voting easier than the Standard Voting Options.

**IV. ANALYSIS**

Even where a district court grants a preliminary injunction, it is unnecessary to definitively resolve the merits. *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984) ("A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment.") As detailed below, the Court finds that Plaintiffs have not met their burden to show that granting them a preliminary injunction is in the public interest. As Plaintiffs are required to make an adequate showing on all four *Winter* prongs, the Court need not analyze the others. *Alliance for the Wild Rockies*, 632 F.3d at 1135.

That being said, the Court asked Defendants a series of pointed questions on the first *Winter* prong at the Motion Hearing. No practical purpose will be served by being coy about the Court's conclusion that Plaintiffs have, at a minimum, raised serious questions on the merits. Two practical purposes will be served by briefly discussing this conclusion. First, it will facilitate this Court's discussion of the "public interest" prong. Second, as the Court observed at the Motion Hearing, the opposition apparently misapprehended the gravamen of Plaintiffs' legal theory. Instead, Defendants misperceived what seems to be a question of first impression (that raises serious questions) as an utterly unmeritorious one.

The questions and answers at the Motion Hearing presumably went a long way in dispelling that notion. However, it is well settled that this Court has the inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The Court is persuaded that judicial economy will be served by briefly setting out two points as declarative statements that the Court was attempting to draw out in the form of questions. The Court will not

go beyond that. To be clear, the Court's discussion of the merits is to facilitate drafting the remainder of this Order and future briefing in this case. The parties should not view this discussion as foreclosing them from making any argument they see fit on the merits of the case in subsequent briefing. The Court will remain open to being persuaded, will consider these arguments *de novo*, and is not bound by its discussion of the merits in this Order. *See Camenisch*, 451 U.S. at 395.

### A. *Winter* Prong 1: Serious Questions on the Merits

As discussed above, the Court will make two points. Defendants' discussion of Plaintiffs' voter dilution claim proceeds from a misunderstanding of the gravamen of that claim, and it is clear that Plaintiffs have raised serious questions on the merits, once that misunderstanding is corrected.

Defendants acknowledge that voter dilution is a recognized category of voting claim. In relevant part the opposition provides as follows:

> [R]egulations that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit' . . . are subject to strict scrutiny . . . . Examples include laws that weigh votes from rural counties more heavily than votes from urban counties. [*Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (quoting *Green v. City of Tucson*, 340 F.3d 891, 900 (9th Cir. 2003))].

(ECF No. 11 at 14 (internal quotation marks removed).)

In the very next paragraph, Defendants explain:

> [T]he VCA — and California election law generally — affords all voters "in a geographically defined governmental unit" (i.e., a county) the same voting options. That the Act permits *different* counties to employ different voting procedures does not alter this fact . . . .
>
> [T]he Supreme Court has "never applied strict scrutiny" to a voting regulation that "discriminates between different electoral units . . ., rather than between voters in any single electoral unit." *Green*, 340 F.3d at 900.

(ECF No. 11 at 15.) Ultimately, after a curt discussion, Defendants conclude the VCA does not present a voter dilution claim.

This conclusion rests on a fundamental misunderstanding. It is undisputed that — for

8

both the 2018 Primary and the 2018 General Election — votes will be cast for offices representing the entire state (e.g., one of California's United States Senators, California Governor, and California Attorney General). As the Court observed at the Motion Hearing, it seems obvious that, for purposes of these *statewide* races, the electoral unit in question is the *state* rather than the individual county.[5] As the Ninth Circuit intimated in *Green*, in evaluating a voter dilution claim, it is crucial to correctly identify the "relevant electoral unit." *Green*, 340 F.3d at 900.

This takes the Court to its second point. The pin-cited portion of *Green* discussing voter dilution claims identifies three Supreme Court opinions: *Gray v. Sanders*, 372 U.S. 368 (1963), *Reynolds v. Sims*, 377 U.S. 533 (1964), and *Moore v. Ogilvie*, 394 U.S. 814 (1969). *See id*. Plaintiffs identify these same cases in their opening brief. Having carefully reviewed these cases, it is apparent that the election regimes challenged in those cases are factually dissimilar from the VCA.[6] That being said, each contains statements about what the Equal Protection Clause demands that, on their face, seem to have broader application. The Court quoted six of these statements at the Motion hearing. The Court will repeat them here (with one minor addition).

*Gray* states: "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray*, 372 U.S. at 379. *Gray* also states: "[T]here is no indication in the Constitution that homesite . . . affords a permissible basis for distinguishing between qualified voters within the State." *Id*. at 380. *Reynolds* states that *Gray* "established the basic principle of equality among voters within a State, and held that voters cannot be classified, constitutionally, on the basis of where they live, at least with respect to voting in statewide elections." *Reynolds*, 377 U.S. at 560. *Reynolds* also states: "Weighting the votes of citizens

---

[5] At the Motion Hearing, Plaintiffs suggested that at least some races for United States Congress were implicated by this action. The Court declines to discuss this further in this Order, as doing so will not facilitate resolution of the instant motion.

[6] It will serve no practical purpose at this point to describe the regimes at issue in *Gray*, *Reynolds*, or *Moore* in detail here. However, for the sake of completeness, the Court will include the parenthetical descriptions of those three cases supplied by the Ninth Circuit in *Green*. *Green* described (i) *Gray* as dealing with a "county unit system that weighted rural votes more heavily than urban votes," (ii) *Reynolds* as dealing with an "apportionment plan for the state legislature that weighted votes from rural counties more heavily [than] votes from urban counties," and (iii) *Moore* as dealing with a "state statute that made it more difficult for residents of populous counties to nominate candidates for the electoral college." *Green*, 340 F.3d at 900.

9

differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids sophisticated as well as simpleminded modes of discrimination."[7] *Id.* at 563 (internal quotation marks omitted). Additionally, *Reynolds* further stated: "Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race," citing *Brown v. Board of Education*, 347 U.S. 483 (1954). *Id.* at 566. *Moore* says: "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Moore*, 394 U.S. at 819.

Defendants' misapprehension of the thrust of Plaintiffs' Equal Protection claim has resulted in inadequate briefing of the merits of this claim. It is enough for now to say Plaintiffs have clearly raised serious questions on the merits of their Equal Protection Claim.

B. *Winter* Prong 2: Irreparable Harm

In their opening brief, Plaintiff states that "the Ninth Circuit has long recognized that constitutional violations in general constitute irreparable harm." (ECF No. 7 at 25–26 (citing, *Stormans, Inc. v. Stelecky*, 586 F.3d 1109, 1138 (9th Cir. 2009), and *Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)).) In essence, Plaintiffs contend that if they show a likelihood of success on a constitutional claim generally (or, perhaps, presumptively) this constitutes an adequate showing of irreparable harm. The opposition has not meaningfully addressed this argument. It is unnecessary to decide this issue in order to resolve the instant motion. Accordingly, the Court declines to do so. Instead, for the remainder of this Order, the Court will assume the following for the sake of argument: (i) Plaintiffs have shown a likelihood of success on the merits of their Equal Protection claim, and (ii) this, without more, is a showing of irreparable harm sufficient to satisfy the second *Winter* prong.

C. *Winter* Prong 3: Balance of the Equities

In Plaintiffs' opening brief, they contend: "The balance of the equities and public interest preliminary injunction factors 'merge when the Government is the opposing party.'" (ECF No. 7

---

[7] The second sentence was not quoted in the Motion Hearing.

at 26 (quoting *Feldman v. Ariz. Sec'y. of State's Office* ("the non-citable *Feldman* panel opinion"), 842 F.3d 613, 627 (9th Cir. 2016)).) In the *Feldman* litigation, the Ninth Circuit granted rehearing en banc and ordered that "[t]he three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit." *Feldman v. Arizona Sec'y of State's Office*, 840 F.3d 1164 (9th Cir. 2016). Accordingly, Plaintiffs should not have cited this case. The case cited for the proposition in the panel opinion, *Nken v. Holder*, 556 U.S. 418 (2009), did not involve a preliminary injunction or an election. Defendants fail to mention the non-citable *Feldman* panel opinion or *Nken* in their opposition. Rather, Defendants' opposition, like Plaintiffs' opening brief, discusses the third and fourth prongs of *Winter* together. (*Compare* ECF No. 11 at 21–24 *with* ECF No. 7 at 25–29.) Interestingly, Plaintiffs' reply discusses these separately. (*See* ECF No. 14 at 17–19.)

As the Court will explain in the following section of the Order, where a requested preliminary injunction in advance of an election threatens to interfere with non-party voters' ability to vote (or otherwise threatens to disenfranchise them), the Ninth Circuit has made clear this implicates the public interest in a particularly acute way. The opposition raises serious concerns about voter disenfranchisement that are not adequately addressed in Plaintiffs' reply. Rather than engaging in a how-many-angels-can-dance-on-the-head-of-a-pin-type of analysis regarding the merger of *Winter* prongs without the benefit of briefing, the Court will explain in the following section why Plaintiffs failed to meet their burden to show that a preliminary injunction is in the public interest. In doing so, the Court will consider Plaintiffs' arguments in its reply under the headings "<u>THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN PLAINTIFFS' FAVOR</u>" and "<u>GRANTING THE INJUNCTION IS IN THE PUBLIC INTEREST</u>." (*See* ECF No. 14 at 17–19.)

D.  *Winter* Prong 4: Public Interest

In the Court's view, the most efficient way to address the public interest prong of *Winter* is to set out Defendants' arguments, followed by the applicable standard, and then explain why Plaintiffs have failed to demonstrate a preliminary injunction is in the public interest.

///

### i. *Defendants' Arguments*

Defendants repeatedly observe the impact of the VCA is speculative and that Plaintiffs have offered no evidence that voter turnout will actually increase in the Opted-In Counties, let alone by how much, assuming there is an increase at all. (*See, e.g.*, ECF No. 11 at 20 ("[E]ven assuming arguendo that different turnout rates could support a voter 'dilution' claim, Plaintiffs offer no evidence of *actual* harm to support their claim. Plaintiffs instead ask this Court to enjoin a state election law on the eve of an election based solely on their speculation of the disparate impact the law *might* have.") (emphasis retained) (internal citations omitted).) This is coupled with detailed arguments that the enforcement of the VCA for the 2018 Primary and the 2018 General Election may lead to disenfranchisement of a significant number of voters in the Opted-In Counties represented in this action. The Court will summarize this second category of arguments in some detail.

With respect to the 2018 Primary, Defendants argue that "[w]ere the Court to enjoin the VCA's operation for the June 5, 2018 election, Defendants would not be able to adequately conduct the election." (ECF No. 11 at 22.) In particular, Defendants observe that "it likely would be impossible for Defendants to locate and secure the required number of polling place locations." (ECF No. 11 at 22 (indicating that Sacramento County would need to "secure approximately 600 polling place locations," while Madera County and Nevada County would each require approximately 40 polling locations).) Even if this could be done, Defendants argue "there is insufficient time to hire and train the significant number of additional poll workers — approximately 300 in Nevada County, 350 in Madera County, and 3,000 in Sacramento County — that would be required (or to retrain workers previously trained on the VCA's new procedures)." (ECF No. 11 at 22 (emphasis removed).) Further, Defendants indicate that "[i]n preparation for their transition to the VCA model, Sacramento County and Madera County have already replaced their antiquated voting systems." (ECF No. 11 at 22.) Defendants argue that "[i]f compelled to revert back to a polling place model, there simply is not enough to [sic] time (or money) to obtain the hundreds of additional voting machines that would be required." (ECF No. 11 at 22.) Defendants cite sworn affidavits from relevant election officials in support of each

of their arguments. (*See* ECF No. 11 at 21–24.)

Defendants' disenfranchisement arguments are not limited to "logistical hurdles." (*See, e.g.*, ECF No. 11 at 22.) Defendants indicate that they have "already conducted substantial public outreach to educate voters about the VCA's new voting process." (ECF No. 11 at 23.) Defendants contend, "[g]iven the substantial work that has been done to educate voters on the VCA model, a last minute switch in voting procedures is certain to confuse — and disenfranchise — voters." (ECF No. 11 at 23.)

Defendants observe that if the Court is persuaded not to enjoin the 2018 Primary for the reasons just discussed, "many of the same logistical hurdles would prevent VCA counties from reverting to the prior polling place model for the November 2018 election." (ECF No. 11 at 24 n.10.) Moreover, Defendants further contend "changing the voting procedures for the second time in a year — and in between primary and general elections — would only increase the risk of voter confusion." (ECF No. 11 at 24 n.10.)

### ii. Public Interest in Election Cases

The concerns of the sort raised in Defendants' opposition are at the heart of the public interest analysis mandated in election cases like the instant action. *See Sw. Voter Registration Educ. Project v. Shelley* ("*SVREP*"), 344 F.3d 914, 919–20 (9th Cir. 2003) (en banc). In *SVREP*, the plaintiffs filed a "lawsuit alleging that the planned use of 'punch-card' balloting machines in the election violates the Equal Protection Clause of the U.S. Constitution and Section 2 of the Voting Rights Act[.]" *Id*. at 916. The plaintiffs claimed "that their right to equal protection is violated because voters in counties that use punch-card machines will have a comparatively lesser chance of having their votes counted than voters in counties that use other technologies." *Id*. at 917. Further, they argued "the counties employing punch-card systems have greater minority populations than counties using other voting systems, so that punch-card use denies the right to vote on the basis of race, in violation of Section 2 of the Voting Rights Act." *Id*. Pursuant to a consent decree, the California Secretary of State had already decertified the use of these punch-card machines in elections effective March 2004 (the next regularly scheduled election). *Id*. at 916–17. The election at issue in *SVREP* was not a regularly scheduled election. Rather, the

October 7, 2003 election was one in which "California voters [were] scheduled to decide whether Governor Gray Davis should be recalled and, if so, who should replace him."[8] *Id*. at 916.

In *SVREP*, the Ninth Circuit, sitting en banc, observed that "[t]here is no doubt that the right to vote is fundamental, but a federal court cannot lightly interfere with or enjoin a state election." *Id*. at 918 (citing *Reynolds*, 377 U.S. at 585). It noted "[t]he decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Id*. The en banc court went on to say:

> In this case, hardship falls not only upon the putative defendant, the California Secretary of State, but on all the citizens of California, because this case concerns a statewide election. The public interest is significantly affected. For this reason our law recognizes that election cases are different from ordinary injunction cases. *See, e.g., Reynolds*[, 377 U.S. at 585]. Interference with impending elections is extraordinary, *id.,* and interference with an election after voting has begun is unprecedented.

*Id*. at 919.

In the next paragraph of *SVREP*, the Ninth Circuit catalogued some of the public interest concerns implicated in that case. These included "resources already invested in reliance" on the election proceeding as planned, along with time and money spent on voter education, training poll workers, and preparing ballots. *Id*. at 919. However, the Supreme Court has made clear these are not the only concerns that should be considered where a requested injunction may interfere with an upcoming election.

In *Reynolds*, upon which *SVREP* relies, the Supreme Court characterized the district court in that case as having "acted in a most proper and commendable manner." *Reynolds*, 377 U.S. at 586. As noted above, the landmark *Reynolds* decision dealt with an "apportionment plan for the state legislature that weighted votes from rural counties more heavily [than] votes from urban counties." *Green*, 340 F.3d at 900. Nevertheless, the Supreme Court specifically indicated that the Court had "initially acted wisely in declining to stay the impending primary election in

---

[8] The California Constitution set the period of time within which the recall election was required to be held after the Secretary of State certified there were sufficient signatures to initiate a recall. *SVREP*, 344 F.3d at 916. Additionally, the California Secretary of State scheduled an "initiative election to the same date as the recall election." *Id*.

14

Alabama," and later added the district court "acted with proper judicial restraint . . . in ordering its own temporary reapportionment plan into effect, at a time sufficiently early to permit the holding of elections pursuant to that plan without great difficulty." *Reynolds*, 377 U.S. at 586.

Moreover, the Supreme Court has made clear that, when requested injunctive relief may lead to disenfranchisement of non-party voters, the impact on such voters should be considered before that injunctive relief is granted. *See Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968); *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). Of course, this includes logistical concerns. *See, e.g.*, *Williams*, 393 U.S. at 35 (taking into account that "[c]ertainly at this late date it would be extremely difficult, if not impossible, for Ohio to provide still another set of ballots"). But, it also requires consideration that the injunction itself may cause voter confusion, which itself "risk[s] . . . interference with the rights of other [non-party] citizens," *Williams*, 393 U.S. at 35, as "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5.

With this in mind the Court will now turn to Plaintiffs' arguments.

### iii. *Plaintiffs Have Not Shown an Injunction is in the Public Interest*

Plaintiffs' argument in its opening brief was essentially a continuation of its argument on the second *Winter* prong. Roughly speaking, Plaintiffs argue that in constitutional cases the *Winter* prongs are like dominoes: According to Plaintiffs, if they can show they are likely to succeed on the merits of their constitutional claim, this tips the first domino and the rest must follow because parties with likely-to-succeed constitutional claims are generally irreparably harmed, the State of California can "derive no legally cognizable benefit" from violating Plaintiffs' constitutional rights, and "the protection of constitutional rights is of the highest public interest." (ECF No. 7 at 26–29.) Additionally, the opening brief included two conclusory statements that arguably touched on the specific concerns presented in cases where a requested order will affect an election. First, citing the non-citable *Feldman* panel opinion, Plaintiffs assert that "the State has not devoted 'enormous resources' to furthering the [VCA]." (ECF No. 7 at 27.) Second, Plaintiffs assert there is no reason to think the 2018 Primary would be disrupted as ballots had not yet been cast and the motion was "filed well ahead of California's primary

15

election." (ECF No. 7 at 27.) Neither statement is supported by anything other than Plaintiffs' counsel's say-so.

The Court has already addressed the disenfranchisement concerns that Defendants raised, which they supported with detailed sworn affidavits from relevant election officials. (*See* ECF No. 11 at 21–24.) Plaintiffs' response in their reply was wholly inadequate. As to Defendants argument that Plaintiffs have no evidence that the VCA will actually increase voter turnout, Plaintiffs respond coming forward with *none*. They simply assert in a conclusory way that this result is "inevitabl[e]." (ECF No. 14 at 15.) It is worth noting, in their opening brief, Plaintiffs more or less acknowledge that it is speculative whether the VCA will achieve its goal. (*See* ECF No. 7 at 24 ("For example, if the Voter's Choice Act permitted all counties to conduct all-mail ballot elections within the same timeframe, voter turnout would increase in all counties — *assuming the provisions of the Voter's Choice Act will increase voter turnout at all* — rather than only increasing voter turnout in certain selected counties.") (emphasis added).)

The Court now turns to Plaintiffs response to Defendants' arguments relating to the disenfranchisement of non-party voters in the relevant Opted-In Counties. Defendants do not argue that the possible disenfranchisement of these voters is not a relevant consideration.[9] Accordingly, one would expect Plaintiffs to address the evidence introduced by Defendants on this topic. Puzzlingly, Plaintiffs do not. Effectively, Plaintiffs remain silent in the face of Defendants' argument that, as a factual matter, it may be physically impossible to conduct an election in the relevant Opted-In Counties due to inadequate numbers of polling stations, workers, and voting machines if the requested injunction is granted. Similarly, Plaintiffs also remained silent about Defendants' concerns regarding voter confusion and its disenfranchising effect. It is worth bearing in mind that Defendants raised these logistical and confusion concerns with respect to both the 2018 Primary and the 2018 General Election.

It is well settled that Plaintiffs bear the burden to show the preliminary injunction they seek is in the public interest. *See, e.g.*, *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011). It is not this Court's role to spin out arguments for why the public interest is served

---

[9] Such an argument could hardly be squared with Supreme Court and Ninth Circuit precedent.

16

by an injunction that Plaintiffs have not made. *See Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") It is no more appropriate for this Court to fill the unexplained silences of Plaintiffs' reply briefs. This is particularly the case where the silence touches on an element where, as here, Plaintiffs bear the burden of persuasion. Simply put, the Court can only conclude that Plaintiffs have failed to meet their burden showing that a preliminary injunction is in the public interest. Plaintiffs failed to address "considerations specific to election cases" that Defendants raised and this Court is required to consider when deciding whether to issue an injunction that will affect an election. *Purcell*, 549 U.S. at 4–5; *see also SVREP*, 344 F.3d at 919 (discussed *supra*). Accordingly, the Court must deny Plaintiffs' motion for failure to make the requisite showing on all four *Winter* prongs.

For completeness's sake, the Court will address one final point raised by Plaintiffs in their reply and reiterated in the Motion Hearing. In short, Plaintiffs observed that "other courts have granted preliminary injunctions in cases with similar and even less time prior to an election."[10] (ECF No. 14 at 17–18.) Plaintiffs cited the following three cases in support of this observation: (i) *New York Progress & Prot. PAC v. Walsh* ("*NYPPP*"), 733 F.3d 483 (2d Cir. 2013), (ii) *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018), and (iii) *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016) (three judge court). (ECF No. 14 at 17–18.)[11] Having carefully reviewed these three cases, the Court remains convinced that Plaintiffs have not met their burden to show granting their motion is in the public interest.

The reason for this is made clear by *NYPPP*. In *NYPPP*, the plaintiff, "an 'unauthorized political committee' formed to advocate in favor of candidates in New York elections, brought

---

[10] Plaintiffs' argument may have been prompted in part by Defendants contention that this motion was barred by laches. It is unnecessary to resolve Defendants' laches argument to resolve this motion. Accordingly, the Court declines to do so.

[11] *Harris* was cited in the Motion Hearing rather than in the briefs. The parties should be advised that it is not this Court's practice to consider authorities cited by the parties in motion hearings that they have not cited in their briefs. The Court does not intend to depart from the practice going forward.

17

suit against election officials in the State and City of New York, as well as the Board of Elections" to enjoin certain election provisions that had the effect of "prevent[ing the plaintiff] from receiving more than $150,000 from any individual contributor in any calendar year." *NYPPP*, 733 F.3d at 485. The plaintiff had "a donor waiting to contribute $200,000 to its cause, allege[d] that, as applied to [the plaintiff], the cap violate[d] its core First Amendment right to advocate in favor of Joseph Lhota in the upcoming New York mayoral election, and [sought] declaratory and injunctive relief." *Id*. The district court denied the plaintiff's motion for a preliminary injunction. *Id*. at 486. The district court expressed concern that granting an injunction as to a single committee may create confusion about the impact of that injunction on other committees close to an election. *Id*. at 489. The Second Circuit reversed and instructed the district court to enter the requested injunction. *Id*. at 489. In reaching this conclusion, the Second Circuit did not disagree that a district court should refrain from granting an injunction that would result in "sufficiently severe disruptions to the election process *itself*." *Id*. (emphasis retained). However, the Second Circuit distinguished *Reynolds* noting that *Reynolds* involved a "complicated process" and there was no "showing [in *NYPPP*] of what burdens would be imposed on the State" by granting the injunction at issue. *Id*.

Nothing in *NYPPP* suggests that this Court should issue an injunction affecting an election, particularly one that affects "the election process *itself*," by mechanically looking to see how many days would separate the order issuing the preliminary injunction and the next election. In the Motion Hearing, Defendants analogized enjoining the VCA to ordering a large ship to turn around. Extending that analogy, the flaw in Plaintiffs' position is quite glaring. In essence, Plaintiffs have observed that over time there have been instances where people suspected *other* ships could turn quickly, in a set amount of time, with little risk to others. This is unhelpful where it is made in a response to a detailed argument why a *particular* ship is slow moving and almost certainly unable to do so in that amount of time without substantial risk to others. Plaintiffs' citation to *NYPPP* does nothing to assure the Court that granting Plaintiffs' motion will not throw the elections in multiple counties into chaos, as Defendants have persuasively suggested.

Neither *League of Women Voters* nor *Harris* warrant detailed discussion. In *League of Women Voters*, the Pennsylvania Supreme Court held that the "Pennsylvania Congressional Redistricting Act of 2011 . . . violate[d] Article I, Section 5 — the Free and Equal Elections Clause — of the Pennsylvania Constitution." *League of Women Voters*, 178 A.3d at 741. The opinion Plaintiffs cite described itself as "setting forth a process assuring that a remedial redistricting plan would be in place in time for the 2018 Primary Elections." *Id.* at 825. Nothing in the *League of Women Voters* suggests the majority of the Pennsylvania Supreme Court perceived that this process would threaten to disenfranchise any voters. Consequently, the Court concludes that Plaintiffs' reliance on this case is misplaced.[12]

The same is true of *Harris* for precisely the same reason. The majority opinion in *Harris* held that "the general assembly's 2011 Congressional Redistricting Plan [was] unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment" and "require[d] that new congressional districts be drawn forthwith to remedy the unconstitutional districts." 159 F. Supp. 3d at 604. Nothing in *Harris* suggests the majority of the three judge court perceived that the remedy it ordered would threaten to disenfranchise any voters.

### V. CONCLUSION

For the foregoing reasons, Defendants' motion for a preliminary injunction is (ECF No. 7) is DENIED.

IT IS SO ORDERED.

Dated: April 24, 2018

Troy L. Nunley
United States District Judge

---

[12] Plaintiffs characterize the Pennsylvania Supreme Court's order as a "significant disruption" and causing "upheaval" weeks before "pertinent deadlines and an election." (ECF No. 14 at 18.) Obviously, this Court does not sit in review of the Pennsylvania Supreme Court. Putting that aside and accepting Plaintiffs' characterization as correct for the sake of argument, this is not an outcome the Court seeks to emulate. Even if arguably the Pennsylvania Supreme Court actions did not accord with Ninth Circuit and United States Supreme Court precedent relating to preliminary injunctions near elections, this would not give this Court license to follow suit.